IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LAMARR D. WILLIAMS         :       CIVIL ACTION
                                          :
       v.                            :
                                          :
ANDREW SAUL[1]                :       NO. 18-4180

O P I N I O N

JACOB P. HART                                        DATE:   10/3/2019
UNITED STATES MAGISTRATE JUDGE

       Lamarr D. Williams brought this action under 42 USC §405(g) to obtain review of the decision of the Commissioner of Social Security denying his claim for Supplemental Security Income ("SSI"). He has filed a Request for Review to which the Commissioner has responded. As set forth below, I recommend that Williams' Request for Review be granted in part and the matter remanded for the taking of evidence from a psychiatric medical expert.

I.       Factual and Procedural Background

       Williams was born on July 26, 1978. Record at 176. He completed high school. Record at 201. He has no significant work record, although he served two years in the army and has held jobs for brief periods since then. Id.

       On December 30, 2014, Williams filed his application for SSI. Record at 176. In it, he asserted disability since February 5, 2012, as a result of depression, a seizure disorder, and mental illness. Record at 176, 200. His application was denied. Record at 75. Williams then sought *de novo* review by an Administrative Law Judge ("ALJ"). Record at 89. A hearing took place in this case on June 26, 2017. Record at 32.

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. Pr. 25(d); and see 42 USC §405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security … .").

In a written decision dated August 25, 2017, however, the ALJ denied benefits. Record at 15. The Appeals Council denied Williams' request for review, permitting the ALJ's decision to stand as the final decision of the Commissioner. Record at 1. Williams then filed this case.

II.     Legal Standards

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389 (1971); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is relevant evidence viewed objectively as adequate to support a decision. Richardson v. Perales, supra, at 401; Kangas v. Bowen, 823 F.2d 775 (3d Cir. 1987); Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979). Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards. Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. §423(d)(1). As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (iv). At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v). At the fifth and last step, we consider our assessment of your residual functional capacity

and your age, education and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 CFR §404.1520 (references to other regulations omitted).

III. <u>The ALJ's Decision and Williams' Request for Review</u>

In her decision, the ALJ determined that Williams suffered from the severe impairments of "jumper's knee" and tendinosis of the right knee, bilateral bunions, a seizure disorder, major depressive disorder, avoidant personality disorder, schizoaffective disorder, and polysubstance dependence disorder. Record at 18. She decided, however, that none of his impairments, and no combination of impairments met or medically equaled a listed impairment. Record at 19.

The ALJ found that Williams retained the residual functional capacity ("RFC") to perform light work, with a limitation to simple, routine tasks, and simple judgment and decision-making. Record at 21. She explained:

> Any production criteria should be capable of being made up by the end of the workday or shift. There should be few, if any, workplace changes, such as that the same duties are performed at the same station or location from day to day. There should be no contact with the general public, only occasional interaction with coworkers and supervisors, and no exposure to unprotected heights or to unprotected moving, mechanical parts.

<u>Id</u>.

Relying upon the testimony of a vocational expert who appeared at the hearing, the ALJ found that Williams could work as a bottle packer, hand bander, or retail trade ticketer/marker. Record at 26. She concluded, therefore, that he was not disabled. <u>Id</u>.

In his Request for Review, Williams argues that the ALJ wrongly assessed the evidence regarding his mental illness, and that she failed to take into account the impact of his mental illness in assessing his compliance with treatment. Finally, he argues that she erred in failing to include in her hypothetical questions to the vocational expert a restriction pertaining to his limitation in concentration, persistence and pace.

III.  Discussion

A.  The Evidence Regarding Williams' Mental Impairments

As above, the ALJ conceded that Williams suffered from the severe mental impairments of major depressive disorder, avoidant personality disorder, schizoaffective disorder, and polysubstance dependence disorder. Record at 18. In assessing whether they met or equaled a listing, the ALJ found that Williams had moderate limitations in understanding, remembering, or applying information; interacting with others; and concentration, persistence, or pace. Record at 19-20. He also had mild limitations in the area of "adapting or managing oneself." Record at 20.

The ALJ recognized that Williams had long been receiving psychiatric medications, and that he had received inpatient treatment for "drug use and mental health problems" three times in 2013, four times in 2014, and twice in 2015. Record at 23. He sought mental health therapy services in January, 2015, reporting symptoms of depression, suicidal ideation, mood swings, anxiety, racing thoughts, problems sleeping, traumatic memories, hallucinations, and paranoia. Id. The ALJ also noted that Williams had reported auditory hallucinations which commanded him to harm himself, and difficulty with authority figures, and crowds. Id.

She decided, nevertheless, that Williams was not as impaired by his mental impairments as he alleged. Id. In reaching this decision, she wrote that his treatment had been effective. Id. She also relied upon some normal examination findings in the medical records; the fact that Williams' therapy in 2015 was only bimonthly; Williams' periodic failure to comply with his medication and therapy regimens; and statements by Williams indicating that he was capable of activities such as personal care, shopping, and socializing with family and friends. Record at 24.

The only medical opinion evidence in the record was from Peter Garito, Ph. D., an agency reviewing expert. Record at 71-2. Overall, he found Williams to be less limited than did the ALJ. Id. The ALJ gave Dr. Garito's findings little weight. Record at 24.

Williams argues that the facts upon which the ALJ relied in finding him not to be as impaired as he alleges were cherry-picked from the record. Indeed, although the record does contain notes showing that William had a normal mental status, the ALJ's citations are not as convincing as they appear at first glance. For one thing, out of the thirteen treatment notes she cited, three citations are to the same February 26, 2015, treatment note – and three others are to the exact same February 26, 2015, note where it was reproduced in another location in the record. Record at 23 (citations to B9F at 2, appearing at Record page 345, and B16F at 9, appearing at Record page 665. Thus, six of the thirteen citations show only one good day.

Secondly, the good day was not altogether good. The February 26, 2015, note, which was prepared by Community Council Health Systems ("CCHS"), did describe Williams as oriented, alert, with an appropriate affect and no delusions or psychosis. Record at 345, 665. However, it also reported that he suffered from auditory hallucinations which "sometimes tell him to do something to hurt himself and threaten to hurt his mother if he does not hurt himself."

5

Id. (Interestingly, on the copy of this note at page 665, the diagnosis of depression on the 345 note was changed to "schizoaffective disorder, depress").

Moreover, the immediately prior note, dated January 28, 2015, reported that Williams was confused, with only fair eye contact, slow and soft speech, impaired concentration, and a flat affect. Record at 336. He had "flight of ideas," deficits in his remote memory, impaired calculations, and impaired insight. Id. This treatment note also mentioned Williams "hearing voices commanding him to hurt himself." Record at 333. Williams told his practitioner that he had an extensive history of homelessness and placements in crisis centers. Record at 332. According to Williams, he was a resident at Devereux Advanced Behavioral Health in his early teens, following "acting out behaviors and suicidal attempts." Record at 333.

A November 30, 2015, treatment note states: "Hears voices; tell him its not worth it and he's better off dead. Tell him to kill himself 'at times.' Resists by talking to people, calling his kids." Record at 673. At this time, he was medicated with Seroquel, an antipsychotic drug. Id. Williams was, nevertheless, neat, clean and cooperative, with grossly intact cognition and normal speech. Id.

On June 3, 2016, Williams again discussed his auditory hallucinations with his CCHS psychiatrist: " 'A lot of chatter', derogatory comments about pt, sometimes tells him to kill himself, not anyone else. Says 'I have been dealing with this since I was a kid.'" Record at 681. His active symptoms were listed as auditory hallucinations, anxiety, and insomnia. Record at 683. Auditory hallucinations also were reported on November 9, 2016. Record at 683.

On March 7, 2017, Williams appeared at CCHS "difficult and agitated" because he had been off his medications for a month: "argumentative, cursing and making inappropriate comments because he felt he was not being treated as he should be." Record at 685. In short, although the treatment notes from CCHS notes showed normal aspects to Williams' mental status and appearance, they also reported serious psychotic symptoms.

Three of the other medical notes cited by the ALJ came from three separate admissions to the Kirkbride Center for drug detoxification. On January 11, 2014, Williams was noted to have a normal appearance, orientation and speech, and an intact memory. Record at 480, 498. However, he also had suicidal ideation, dysphoria, and poor insight. Record at 480. He was homeless. Record at 477. He remained at Kirkbride for a month, until February 10, 2014. Record at 478.

Again, during an admission from May 16 to 22, 2015, Williams was diagnosed with a schizoaffective disorder, and cannabis and PCP use disorders. Record at 507. He was described as having hallucinations, delusions, agitation, and depression, as well as suicidal ideation. Record at 509. He was noted to be cooperative and fully oriented, with normal speech and coherent thought processes. Record at 534. However, he was also described as having poor judgment, poor memory, an unfocused attention level, and a flat affect. Id. It was checked off that he was "much improved" at discharge, as the ALJ noted. Record at 508.

Despite being "much improved" on May 22, 2015, it appears that Williams was readmitted to Kirkbride on May 25, 2015. Record at 526. He was still homeless, and left Kirkbride against medical advice on June 21, 2015, angry because it appeared that he would not obtain housing through his treatment. Record at 525.

The Kirkbride admissions were not Williams' only inpatient treatment during the relevant period. The record also contains notes from three admissions to Friends Hospital, two for several days in 2013, and one 23-hour admission in 2014. All of these admissions involved the use of PCP and marijuana. Record at 272, 295, 298. However, they also resulted in psychiatric diagnoses: depression and anxiety in 2013, and psychosis on January 9, 2014. Record at 272, 296, 298.

Upon the first admission to Friends Hospital on August 20, 2013, Williams reported "vague auditory hallucinations." Record at 298. On October, 2013, he denied hallucinations, and was found to have no psychosis. Record at 295. On January 9, 2014, however, upon this third admission to Friends Hospital, Williams was said to have "ideas of reference and paranoid delusions" as well as visual hallucinations, suicidal ideation and worsening depression, after having "binged" on PCP. Record at 278, 285.

Williams testified as to auditory hallucinations at his hearing before the ALJ. He stated that hearing voices made it hard to work, and said: "it's really like a number of them but … the ones that really get to me is the ones that just tell me stuff to do." Record at 37. He said some voices have told him to hurt himself, and some have told him to hurt other people: "It's just – it's telling me a lot of bad stuff about myself." Id. When asked how often he heard voices, Williams told the ALJ "there's always some kind of chatter going on to tell you the truth." Record at 40.

The ALJ asked Williams whether his substance abuse was causing his hallucinations, but Williams replied that he did not think so because he had been diagnosed with schizophrenia as early as his treatment at Devereux, "before I even touched a drug." Record at 38. Williams said

8

that he was not using drugs at the time of his hearing, but was very vague about when he had stopped using them.  Id.

As noted, the ALJ also relied upon statements Williams made in his function report, indicating that he was capable of a range of daily activities, such as taking care of his own personal care, preparing simple meals, and leaving the house alone to do chores.  Williams had an injury to his knee in June, 2015, while playing basketball, suggesting to the ALJ "that he could interact with others and/or in public places to the extent necessary to participate in sports activity."  Record at 24.

Indeed, Williams indicated that he prepared sandwiches and frozen meals daily, and sometimes swept the front and back yards (he was living with his mother at this time).  Record at 220.  He also wrote that he went to stores to shop for clothes once per month.  Record at 221.  He checked off that he had no problem with personal care such as bathing, dressing, and feeding himself.  Record at 219.  It is also true that Williams reported a basketball injury sustained in June, 2015, although he said that another source of his pain was a mugging in July, 2015.  Record at 206.

As a whole, therefore, it is probably not accurate to say that the ALJ "cherry-picked" the positive observations from the medical record, since Williams was consistently described as well-oriented, cooperative and courteous.  Nevertheless, neither would it be correct to say that these notes give a full picture of the evidence regarding Williams' mental functioning.  It is possible that an individual with constant auditory command hallucinations could attain the necessary stability to maintain employment, but it does not seem realistic for a lay person such as the ALJ to assume that this would be the case in every instance.

Further, Williams' frequent mental hospitalizations and long periods of homelessness were strong evidence of a lack of stability. Although substance abuse was involved in all of Williams' hospitalizations, there was always a separate diagnosis of mental illness. The ALJ's decision does not discuss whether, or to what extent, substance use contributed to his mental status.

Notably, as mentioned above, the ALJ did not base her decision on any opinion from a mental health expert. Williams was not examined by an independent mental health professional, nor did he submit an opinion from any of his treating practitioners. Yet, the evidence regarding Williams' mental health is ambiguous enough that the record would benefit from professional input. Accordingly, I will remand this matter for the purpose of obtaining evidence from a mental health expert who can review Williams' records and either appear for questioning, or respond to written interrogatories.

B.  Lack of Compliance

As discussed, the ALJ decided that Williams was not disabled by his mental illness partly because of his failure to comply with prescribed medication and treatment. Record at 23-24. She pointed out that, upon his Kirkbride admission on May 16, 2015, he was noted to be "semi-compliant" with his CCHS treatment. Record at 24, 509. Also, he left Kirkbride on June 21, 2015, against medical advice. Record at 24, 525.

Williams argues that the ALJ failed to consider whether his mental illness contributed to his noncompliance. He cites Mendez v. Chater, 943 F. Supp. 503, 508 (E.D. Pa. 1996), where the court wrote of a plaintiff: "any noncompliance on her part could have been a result of her mental impairment."

The Commissioner suggests in her response that, as discussed in Social Security Ruling 16-3p, Williams' lack of compliance showed that his mental health was less impaired than he alleged, i.e., that he failed to comply with his treatment because he did not actually need it. The evidence, however, does not support this argument. On the contrary, it is obvious that Williams' failure to comply with his medication led to exacerbation of his mental health symptoms; this was shown by the May 16, 2015, Kirkbride admission cited by the ALJ, and also by the March 7, 2017, treatment note from CCHS, where Williams was "difficult and agitated", "argumentative, cursing and making inappropriate comments" because he had been off his medication for a month. Record at 685.[2]

Upon remand, the medical expert should be asked to comment about the possibility that Williams' inconsistent compliance with his mental health treatment was causally related to his mental illness.

C. <u>Accommodation for Williams' Limitation in Concentration Persistence and Pace</u>

In her hypothetical questions to the vocational expert, the ALJ specified that she needed jobs involving "simple, routine tasks, simple judgment and decision making." Record at 49. She continued: "Any production criteria should be capable of being made by the end of the work day or shift." Id. Williams argues that this was not adequate to address the moderation limitation in concentration, persistence, and pace from which the ALJ found him to suffer.

There is a great deal of disagreement – even within this District – as to what needs to be said in a hypothetical question to a vocational expert about an applicant who is impaired in concentration, persistence and/or pace. See e.g., <u>Sawyer v. Berryhill</u>, 305 F. Supp.3d 664 (E.D.

---

[2] A person can be denied benefits for refusing to follow prescribed treatment. 20 CFR §416.930. However, the Commissioner concedes in her response that the ALJ did not rely on this regulation, which pre-supposes a finding of disability.

11

Pa. 2018); Zukina v. Berryhill, Civ. A. No. 16-4166, 2018 WL 1794537 at *4 (E.D. Pa. Apr. 13, 2018); Gonzalez v. Colvin, Civ. A. No. 16-2241, 2016 WL 9447032 (E.D. Pa. Dec. 5, 2016), adopted 2017 WL 3390267 (Aug. 7, 2017).

A mere limitation to unskilled or simple, routine tasks has been found by many courts to be inadequate to address a moderate limitation in this area. See Sawyer, supra, and cases cited therein. However, the ALJ in this case crafted a more detailed limitation, specifying that production criteria should not be onerous. Even Sawyer, of course, is not binding on this Court. I cannot, therefore, find that the ALJ's hypothetical question was erroneous. In any case, it is possible that the new medical evidence taken upon remand will change the ALJ's view of Williams' RFC.

V.      Conclusion

In accordance with the above discussion, I conclude that Williams' Request for Review shall be granted in part, and the matter remanded for the taking of evidence from a psychiatric medical expert.

BY THE COURT:


/s/Jacob P. Hart
_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE